SAMUEL SHUSTER, Plaintiff-Appellant, v. ROBERT M. BRANTLEY *et al.*, Defendants-Appellees.

First District (5th Division) No. 1—88—2366

Opinion filed May 11, 1990.

Herbert F. Stride, Ltd., and William J. Harte, Ltd., both of Chicago (William J. Harte and Herbert Stride, of counsel), for appellant.

Orner & Wasserman, of Chicago (Esther Joy Schwartz and Mary A. Mazurk, of counsel), for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Samuel Shuster, appeals from a judgment entered on a jury verdict awarding $72,000 to him for injuries sustained when he was hit by an automobile. He contends that the jury's determination that he was 92% negligent was against the manifest weight of the evidence. We affirm.

The accident involved in this appeal occurred on Solidarity Drive, an east-west road which runs between Lake Shore Drive on the west to Adler Planetarium on the east in Chicago. The road has four eastbound lanes and four westbound lanes divided by a large, grassy, median strip. The four lanes on either side of the median strip consist of a parking lane north and south of two traffic lanes. There are "breaks" at various points in the median strip to allow traffic to cross over from either the eastbound to the westbound or the westbound to the eastbound lanes. Plaintiff was struck by an automobile driven by defendant Robert Brantley and owned by defendants James and Diane Newman in the vicinity of the first such break east of Lake Shore Drive.

Plaintiff testified that he arrived in the area of Solidarity Drive at about 11:30 a.m. on June 14, 1984, to act with his friend, Timothy Furgeson, in a short video which was being directed by Michael Dawson. At about 12:30 p.m., after completing a scene of the video, plaintiff and Furgeson left a taxicab in the area of the first break in the median strip and headed towards the north side of the westbound lanes to begin shooting again. At the time, pedestrian traffic was heavy and vehicle traffic light. Furgeson proceeded ahead of plaintiff and had already crossed the westbound lanes when plaintiff turned northbound on a sidewalk in the median strip and began walking in the direction of the four westbound lanes.

As plaintiff approached the south parking lane of the westbound lanes, he looked in all directions and saw light traffic going westbound on Solidarity Drive. When he arrived at the point where the sidewalk met the south parking lane, he again looked in all directions

and could not see any traffic which would create a hazard. Plaintiff proceeded into the parking lane, again looking in both directions, and began crossing that lane. Although there was a solid line of parked cars to his right, the closest being between one and five feet away from him, the cars did not obstruct his vision of the road as he proceeded through the parking lane.

Plaintiff took two or three uninterrupted, long strides through the parking lane with the last stride taking him into the southernmost traffic lane. Though he was familiar with the westbound flow of the traffic lanes, he first looked to his left as he stepped into the traffic lane. After doing this, he then looked to his right, the direction from which traffic was coming, and saw a car approximately 5 to 10 feet from him travelling in his direction. He tried to pull back but the car's left front bumper hit his right ankle. As a result of the impact, plaintiff was twirled around counterclockwise and thrown over the left front fender of the car. As he was spinning over the side of the car, his elbow broke the driver's side window. When the car passed, he landed on the ground.

Plaintiff testified that he did not know how fast the car was travelling at the time of the impact. Additionally, he did not recall seeing his director, Michael Dawson, from the time he began proceeding to cross the westbound lanes to the time of the accident.

Timothy Furgeson, who was plaintiff's good friend, testified that when he crossed the westbound traffic lanes, he first looked to his right to see if any traffic was coming. He only saw a mail truck about three quarters of a block away and, after signaling the truck and getting approval to cross, he proceeded to jog across the street. At the time, plaintiff was behind him and Furgeson did not know whether Michael Dawson had joined plaintiff. When Furgeson arrived on the north side of Solidarity Drive, he heard a thud and then turned and saw plaintiff on the ground, screaming in pain, and a dark-colored station wagon parked on an angle close to the middle of the two westbound traffic lanes.

Michael Dawson testified that after shooting a scene of his video, he joined plaintiff and Furgeson in the area of the first break in the median strip and there directed the taxi driver back to the starting point of the scene. He then directed plaintiff and Furgeson to come with him back to their starting point on the north side of the westbound lanes of Solidarity Drive. Furgeson proceeded across the street first and then Dawson began to cross. He recalled turning back and seeing plaintiff about 6 to 12 feet away and then turning back to continue across the street. When he got a couple of feet into the south-

ernmost traffic lane, he looked to his right, saw a station wagon coming his way and stopped suddenly. He estimated the speed of the car at 30 miles per hour. Shortly after the car passed him, he heard a thud and then looked to his left and saw plaintiff spinning toward him.

Robert Brantley testified that on June 14 he drove Diane Newman to a doctor's appointment downtown and then drove out to Solidarity Drive to spend some time while waiting for her. At approximately 12:45 p.m., he left the area around Adler Planetarium and drove in the southern westbound traffic lane towards Lake Shore Drive. Traffic was fairly heavy at the time and there were a lot of adults and children in the area. He was driving at a rate of speed of about 20 to 25 miles per hour. When he was in the area of the first break in the median strip, he suddenly struck an object. He did not actually see the impact, but recalled that he was looking around at the time. At the time of the accident, he did not have his foot on the brake and could not recall if his foot was on the accelerator but did know that he was decreasing the speed of the vehicle because he was coming to a stop sign at Lake Shore Drive. He might have been looking to his right to get to the right-hand lane because he knew he was going to have to make a right-hand turn onto Lake Shore Drive. After the impact, he stopped the vehicle and learned that he had hit plaintiff.

Plaintiff contends that it is clearly evident that the jury's finding that he was 92% negligent was against the manifest weight of the evidence. He argues that the evidence proves that he was exercising reasonable care at all times prior to the accident but that Brantley failed to exercise reasonable care when operating his automobile. He seeks a new trial solely on the question of the proportion of negligence attributable to the conduct of the parties. On balance, we find no merit to this issue.

■ A jury verdict should be reversed and a new trial ordered only where the verdict is against the manifest weight of evidence. (*Baumgartner v. Ziessow* (1988), 169 Ill. App. 3d 647, 661, 523 N.E.2d 1010, 1019.) A verdict is against the manifest weight of the evidence when a contrary verdict is clearly evident. (*Parsons v. Winter* (1986), 142 Ill. App. 3d 354, 358, 491 N.E.2d 1236, 1239.) A reviewing court should not reverse the verdict of a jury simply because different inferences or conclusions could be drawn from the evidence. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412-13, 476 N.E.2d 1232, 1236.

■ The jury's verdict, based on an apportionment of negligence

of 92% to plaintiff and 8% to Brantley, was not against the manifest weight of the evidence. The evidence is sufficient for the jury to conclude that plaintiff was not in the exercise of reasonable care when he entered the westbound traffic flow lanes. Plaintiff's own testimony indicates that he walked into the traffic lane without hesitation. He said that he took two or three long strides to cross the parking lane and his last stride brought him into the traffic lane. Additionally, he testified that although he was familiar with the flow of traffic in the westbound lanes, he first looked to his left upon entering the traffic lane. Only after first looking to his left did he then look to his right, the direction from which traffic was coming, and see Brantley's car 5 to 10 feet away and coming right at him. Though it is true that he also testified that he was looking both to his left and right as he approached the westbound lanes and crossed the parking lane, the crucial moment for him to be looking to his right was as he was entering and crossing the traffic lanes. His testimony shows that he did not do so until he was no more than 10 feet from an oncoming vehicle. The jury reasonably could have concluded that this was negligence on his part.

Though Brantley's testimony could support a conclusion that he was not exercising reasonable care when he was driving in the westbound lanes, we cannot say that such conclusion is clearly evident. Brantley's testimony does show that he was aware of heavy pedestrian traffic in the area, including children, that he did not see his car hit plaintiff and that he may have been looking to his right at the moment of impact to switch lanes to get ready to turn right onto Lake Shore Drive. But, a jury could also have concluded that he was exercising reasonable care, travelling at a rate of speed of 20 to 25 miles per hour, but hit plaintiff when plaintiff unexpectedly and suddenly walked into the path of his vehicle.

On the evidence in this case, a jury could have concluded that here, as in more conventional "dart out" cases, the driver of the vehicle had very little, if any, opportunity to avoid hitting the pedestrian. Such a conclusion is reasonable when one takes a look at the evidence from the perspective of the driver of the vehicle. According to the undisputed evidence, Brantley was travelling in the westbound traffic lane closest to the south parking lane, which was filled with a solid line of parked cars. Plaintiff entered the traffic lane suddenly and without first looking to his right, the direction from which Brantley was coming. Brantley did not see plaintiff before he hit him. Considering these undisputed facts, it was not against the manifest weight of the evidence for the jury to conclude that Brantley did not see

plaintiff because he suddenly appeared from the parked cars and was immediately struck. If in fact Dawson was present at the time and was nearly hit by the car, it is possible that his presence blocked out Brantley's vision of plaintiff. Also, though plaintiff testified that when he first looked to his right after entering the traffic lanes he saw the car 5 to 10 feet away, the jury could have concluded that even that distance was too short for the driver of any car, even at the rate of speed of 20 to 25 miles per hour, to stop. Considering all of this evidence together with the evidence of plaintiff's lack of care, we find insufficient basis for a reversal.

A case somewhat similar to the present case is *Baumgartner v. Ziessow* (1988), 169 Ill. App. 3d 647, 523 N.E.2d 1010. There, plaintiff was injured when a minibike he was riding was struck by defendant's vehicle. The proof showed that plaintiff was riding the minibike in the right shoulder of the roadway in full view of defendant prior to the accident. The proof showed a dispute in the evidence, however, as to whether plaintiff suddenly and without warning turned his minibike into the path of defendant's vehicle when defendant's vehicle was only 10 feet away. On this proof, the jury returned a verdict in plaintiff's favor but reduced the amount of his damages by 95%, the amount of negligence it allocated to him. On appeal, the *Baumgartner* court affirmed the jury verdict, finding that it was not against the manifest weight of evidence. In the present case, the same sort of factual situation is present and the jury chose a similar allocation of negligence. There is evidence sufficient to support a conclusion that plaintiff suddenly and without warning walked into defendant's path when he was a short distance away, and the jury allocated 92% of the negligence to him. As in *Baumgartner*, we find that the jury's verdict was not against the manifest weight of the evidence.

Plaintiff argues that *Junker v. Ziegler* (1986), 113 Ill. 2d 332, 498 N.E.2d 1135, supports his position that the jury's verdict was against the manifest weight of the evidence. In *Junker*, plaintiff was injured when a hunter fired a shot into a duck blind where he knew plaintiff was standing and struck him in the eye. The evidence showed that the owner of the duck blind knew from experience that someone shooting from the hunter's duck blind could hit someone in plaintiff's duck blind. The jury returned a verdict in plaintiff's favor but reduced the damages awarded by 65% based on his negligence. The trial court ordered a new trial, but the appellate court reversed. Our supreme court then reversed the appellate court and directed that a new trial be held on the issue of damages, finding that a verdict attributing 65% of the fault to plaintiff was against the manifest weight of evi-

dence. *Junker*, 113 Ill. 2d at 340, 498 N.E.2d at 1138-39.

The *Junker* case is factually distinguishable from the present case because in *Junker* the defendant knew that plaintiff was present in the duck blind and yet fired in his direction. Furthermore, the defendant owner of the duck blind was well aware that a person in the duck blind where the defendant shooter was standing could hit a person in the blind where plaintiff was standing. The jury in the present case, however, reasonably could have concluded that Brantley did not know that plaintiff would suddenly walk into his path and thus he had virtually no opportunity to avoid hitting him.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

COCCIA, P.J., and LORENZ, J., concur.